**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | |
|---|---|
| **LUKE GAGORIK, AUDRIANA HUGHES, BRYANNA CARCEDO, ANDREW JARVIS, TION EDMONDS, and CRYSTAL MCKOY, on behalf of themselves and all others similarly situated,** | |
| **Plaintiffs** | |
| **v.** | **Case No.**   3:21cv255 |
| **URBAN INNOVATIONS LLC d/b/a THE CIRCUIT ARCADE BAR,** | |
| **RVA 2, LLC d/b/a SLINGSHOT SOCIAL GAME CLUB,** | **JURY TRIAL DEMANDED** |
| **ROBERT LUPICA,** | |
| **and** | |
| **INGRID LUPICA,** | |
| **Defendants.** | |

## COLLECTIVE ACTION COMPLAINT

Plaintiffs Luke Gagorik, Audriana Hughes, Bryanna Carcedo, Andrew Jarvis, Tion Edmonds, and Crystal McKoy ("Plaintiffs"), by counsel, on behalf of themselves and all others similarly situated, submit the following Collective Action Complaint under Section 16(b) of the Fair Labor Standards Act of 1938, 29 U.S.C. § 201, et seq. ("FLSA"), to recover unpaid wages, liquidated damages, interest, and reasonable attorneys' fees and costs, and allege as follows:

## PARTIES

**A.      Defendants**

1.      Defendant Urban Innovations, LLC ("Urban Innovations") is a limited liability company organized under Virginia law.  Urban Innovations' principal office address is 11512 Bridgetender Dr., Henrico, Virginia 23233.  Urban Innovations' Registered Agent is Robert Lupica.  Upon information and belief, Urban Innovations is wholly owned by Robert and Ingrid Lupica.

2.      Defendant RVA 2, LLC ("RVA 2") is a limited liability company organized under Virginia law.  RVA 2's principal office address is 11512 Bridgetender Dr., Henrico, Virginia 23233.  RVA 2's Registered Agent is Robert Lupica.  Upon information and belief, RVA 2 is wholly owned by Robert and Ingrid Lupica.

3.      The Circuit Arcade Bar ("Circuit") is an entertainment venue, bar and eatery located at 3121 W. Leigh St, Richmond, VA 23230.  "The Circuit (Arcade Bar)" is a fictitious name held by Urban Innovations, which is Circuit's sole owner.

4.      Slingshot Social Game Club ("Slingshot") is an entertainment venue, bar and eatery located at 3301 W. Clay St, Richmond, VA 23230.  Upon information and belief, Slingshot is wholly owned by RVA 2, and therefore ultimately owned by Robert and Ingrid Lupica.

5.      Robert Lupica ("Mr. Lupica") is an individual and a resident of Virginia.  Mr. Lupica is the Registered Agent for Circuit, RVA 2, and Urban Innovations.  Mr. Lupica is a member of both Urban Innovations and RVA 2.  Upon information and belief, Mr. Lupica is also a manager of Urban Innovations and RVA 2.

2

6.      Ingrid Lupica ("Mrs. Lupica") is an individual and a resident of Virginia.  Upon information and belief, Mrs. Lupica is a member of both Urban Innovations and RVA 2.  Upon information and belief, Mrs. Lupica is also a manager of both Urban Innovations and RVA 2.

7.      Collectively, the aforementioned entities and individuals are the "Defendants." Where appropriate, Mr. and Mrs. Lupica are collectively referred to as the "Lupicas" or "Individual Defendants," and Slingshot, Circuit, RVA 2 and Urban Innovations are collectively referred to as the "Defendant Entities."

**B.      Plaintiffs**

8.      Plaintiff Luke Gagorik ("Plaintiff Gagorik") is a former employee of Defendants. Plaintiff Gagorik worked at Circuit from January 13, 2018 until June 27, 2020.  In early 2018, "Circuit Vintage Arcade Bar & Grill" posted an advertisement on Indeed.com seeking applicants for the positions of "Hostess, Beer Tap Associate, Games Techs Food/Flatbread makers," with compensation in the form of a "higher hourly wage with tip sharing."  On January 12, 2018, Plaintiff Gagorik submitted an online application via Indeed.com.  The next day, Mr. Lupica interviewed Plaintiff Gagorik and offered him the position of Beer Tap Associate, which Plaintiff Gagorik accepted.  Plaintiff Gagorik held the position of Beer Tap Associate from January 13, 2018 until December 2019, when he was promoted to General Manager.  Plaintiff Gagorik held the position of General Manager from December 2019 until his last day of employment on June 26, 2020.  Both positions Plaintiff Gagorik held—Beer Tap Associate and General Manager— were "customer-facing," and, in these roles, Plaintiff Gagorik regularly received tips from customers via the Point of Sale ("POS") system utilized by Defendants.  For the duration of his employment, the tips Plaintiff Gagorik received via Defendants' POS system were subject to

Defendants' unlawful tip retention policies, and the hours Plaintiff Gagorik worked were subject to Defendant's unlawful timekeeping and overtime policies.

9.      Plaintiff Audriana Hughes ("Plaintiff Hughes") is a former employee of Defendants.  She worked at Slingshot from November 7, 2019 to June 27, 2020.  Plaintiff Hughes applied for a position with Defendants through Indeed.com after seeing a posting for Shift Manager / Shift Leader / POS Attendant at Circuit.   Plaintiff Hughes interviewed for a position with Defendants on September 27, 2019, in person, at Circuit.  The interview was conducted by Tion Edmonds, a former employee of Defendants, who, at that time, was Circuit's General Manager. During the interview, Plaintiff Hughes was told that the opening was for a position with Slingshot, and that the compensation for the position would be $12.00 per hour, plus tips.  Plaintiff Hughes was also told that she was guaranteed up to 40 hours of work per week at Slingshot, and that if she wanted more hours, she could get them by working at Circuit.  Plaintiff Hughes was offered the position during the interview, which she accepted.  In December 2019, Plaintiff Hughes was promoted to Assistant Manager of Slingshot.  She held this position until June 27, 2020, her last day of employment.  Both positions Plaintiff Hughes held—Shift Leader and Assistant Manager— were "customer-facing," and, in these roles, Plaintiff Hughes regularly received tips from customers via the POS system utilized by Defendants.  For the duration of her employment, the tips Plaintiff Hughes received via Defendants' POS system were subject to Defendants' unlawful tip retention policies, and the hours Plaintiff Hughes worked were subject to Defendant's unlawful timekeeping and overtime policies.

10.      Plaintiff Bryanna Carcedo ("Plaintiff Carcedo") is a former employee of Defendants.  She worked at Slingshot as a Bartender from October 2019 to June 27, 2020.  Plaintiff Carcedo learned of the Bartender position from a job posting on Indeed.com, and submitted an

application through the website.  During her interview, Plaintiff Carcedo was told that she and the other Bartenders would receive an hourly wage of $13.00.  Plaintiff Carcedo held the position of a Bartender until June 27, 2020, her last day of employment.  While employed, Plaintiff Carcedo regularly received tips from customers via the POS system utilized by Defendants.  For the duration of her employment, the tips Plaintiff Carcedo received via Defendants' POS system were subject to Defendants' unlawful tip retention policies, and the hours Plaintiff Carcedo worked were subject to Defendant's unlawful timekeeping and overtime policies.

11.     Plaintiff Andrew Jarvis ("Plaintiff Jarvis") is a former employee of Defendants. Plaintiff Jarvis interviewed for a position with Defendants in early February 2019.  On or around February 15, 2019, he was hired to work at Circuit as a kitchen worker.  Plaintiff Jarvis was promoted to Shift Lead on or around November 2019 and again to Manager of Alcohol and Alcohol Purchase on or around March 2020.  Plaintiff Jarvis also worked at Slingshot on a number of occasions.  In November 2019, for example, while he was working at Circuit, Plaintiff Jarvis was instructed by Defendants to assist with the opening of Slingshot, which he did as both a kitchen worker and as a Beer Tap Associate. In the spring of 2020, Defendants again instructed Plaintiff Jarvis to work at Slingshot, this time to assist with the venue's reopening in the midst of the COVID-19 pandemic. During this time, his title remained Manager of Alcohol and Alcohol Purchase for Slingshot.  He held the position of Manager of Alcohol and Alcohol Purchase until June 16, 2020, his last date of employment.  While employed, Plaintiff Jarvis regularly received tips from customers via the POS system utilized by Defendants.  For the duration of his employment, the tips Plaintiff Jarvis received via Defendants' POS system were subject to Defendants' unlawful tip retention policies and the hours Plaintiff Jarvis worked were subject to Defendant's unlawful timekeeping and overtime policies.

12.     Plaintiff Crystal McKoy ("Plaintiff McKoy") is a former employee of Defendants. She was employed from July 2019 to June 2020.  Plaintiff McKoy worked at Circuit from July 2019 to November 2019.  During this time-period, she worked as a Point of Sale Attendant, a Beer Tap Associate, Event Coordinator, and Event Manager.  Around October 2019, Plaintiff McKoy was assigned to work at Slingshot as a Barback and to assist with the venue's opening.  While employed, Plaintiff McKoy regularly received tips from customers via the POS system utilized by Defendants.   For the duration of her employment, the tips Plaintiff McKoy received via Defendants' POS system were subject to Defendants' unlawful tip retention policies, and the hours Plaintiff McKoy worked were subject to Defendant's unlawful timekeeping and overtime policies.

13.     Plaintiff Tion Edmonds ("Plaintiff Edmonds") was hired at Circuit in April of 2018 as a Game Technician.  In March of 2019, Plaintiff Edmonds was promoted to Assistant General Manager of Circuit. In September 2019, Plaintiff Edmonds was promoted to General Manager of Slingshot.  Plaintiff Edmonds held this position until June 11, 2020, when the employment relationship was terminated.  While employed, Plaintiff Edmonds regularly received tips from customers via the POS system utilized by Defendants.  For the duration of Plaintiff Edmonds' employment, the tips Plaintiff Edmonds received via Defendants' POS system were subject to Defendants' unlawful tip retention policies, and the hours Plaintiff Edmonds worked were subject to Defendant's unlawful timekeeping and overtime policies.

14.     Plaintiffs consent in writing to be parties to this FLSA action pursuant to 29 U.S.C. § 216(b).  Plaintiffs' Consent Forms are attached as Exhibit A.

15.     As this case proceeds, it is likely that other individuals will sign consent forms and opt into this action as plaintiffs.

## JURISDICTION & VENUE

16.     This Court has jurisdiction over Plaintiffs' FLSA claims under 28 U.S.C. § 1331 and 29 U.S.C. § 216(b).

17.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because the Defendants reside in this judicial district and a substantial part of the events that form the basis for this action occurred in this judicial district.

## COVERAGE UNDER THE FLSA

18.     At all relevant times, Defendants have exercised common control over the entertainment venues at issue, and have engaged in the uniform operation of those venues, for the common business purpose of managing, maintaining, and profiting from those venues. Accordingly, Defendants constitute an "enterprise" under 29 U.S.C. § 203(r)(1).

19.     Upon information and belief, the gross revenue of each of the Defendant Entities has exceeded $500,000 for each calendar year in which such entities have operated.  Accordingly, at all relevant times, each of the Defendant Entities has been an "enterprise engaged in commerce or in the production of goods for commerce" under 29 U.S.C. § 203(s)(1)(A)(ii).

20.     At all times relevant, Plaintiffs and those similarly situated were "employees" of Defendants under 29 U.S.C. § 203(e)(1).

21.     At all relevant times, the Individual Defendants exercised substantial operational control over the Defendant Entities.  Upon information and belief, the Individual Defendants are the sole owners of the Defendant Entities.  They are also heavily involved in the management and everyday operations of the Defendant Entities.  For example, the Individual Defendants established and implemented the tip retention and overtime policies at issue in this action.  They also directly supervise both managerial and non-managerial employees of the Defendant Entities, retain the

authority to hire, fire, and discipline those employees, and establish the terms and conditions of the employees' work, which includes but is not limited to the rates and methods of the employees' compensation. Furthermore, each of the Defendants maintained control, oversight, and direction over Plaintiffs and similarly situated employees, including, but not limited to, hiring, firing, disciplining, timekeeping, payroll, tips, pay rates, and other practices. Accordingly, all Defendants, consisting of both the Individual Defendants and the Defendant Entities, are "employers" under 29 U.S.C. § 203(d).

22.     Furthermore, the Defendants operate as a single, integrated enterprise, with common management, common ownership, and common financial control. Defendants apply or cause to be applied substantially the same employment policies, practices, and procedures to all employees at all locations, including policies, practices and procedures relating to payment of minimum wages, overtime wages, timekeeping, and tip retention. Furthermore, the work performed by Plaintiffs and those similarly situated directly benefits each of the Defendants. Consequently, at all relevant times, Defendants have been "joint employers" of Plaintiff and all others similarly situated.

## FACTUAL ALLEGATIONS

### A.     Circuit.

23.     Circuit opened on or around October 18, 2017. It is described on its website as a "retro and modern arcade bar, offering a vintage vibe with ultra-modern amenities." Those amenities include a full food menu and approximately fifty self-serve taps featuring beer, wine, and other beverages.

24.     In order to use the self-serve taps at Circuit, customers must first visit the check-in counter near the entrance, open a tab, and obtain a Beer Card, which can then be inserted into the

card readers located directly above each of the self-serve taps.  Once the Beer Card is inserted into the reader, customers may pour the desired quantity of their beverage of choice.  Each tap is outfitted with a digital screen that informs customers how many ounces of the beverage have been poured, and the total charges incurred on the Beer Card.

25.     In order to open a tab at Circuit, customers are required to place a credit or debit card on file.  When closing their tabs, customers may either charge the card on file or pay via another method, such as cash.  Customers are also required to return their Beer Card when closing their tabs.  If a customer forgets or decides not to close his or her tab, Circuit charges the card on file a percentage of gratuity and an additional five dollars.

**B.      Slingshot.**

26.     Slingshot opened on or around November 8, 2019.  Its business model is essentially identical to that of Circuit.  It offers a full food menu, a beer wall with over forty self-serve taps, and a number of interactive games.  Like Circuit, customers must open a tab at the check-in counter and obtain a Beer Card in order to access the taps.  And, if a customer's tab is not closed, Slingshot also charges a percentage of gratuity and an additional five dollars. The primary difference between Circuit and Slingshot are the types of games offered at each venue.  While Circuit brands itself as an "arcade bar" featuring pinball machines and classic arcade games like Pac-Man, Slingshot focuses on what it refers to on its website as "games that have more of a social element to them," including bocce ball, "superskee" and "extreme duckpin."  Slingshot also features a full-service bar at the center of the venue, where customers may pay either by charging their tabs or via another method, such as cash.

**C.     The Toast Point of Sale System.**

27.     Both Slingshot and Circuit utilize a popular Point of Sale (POS) system called "Toast." Toast is an all-in-one POS system designed specifically for the restaurant industry, with features including order management, inventory management, payroll, and timekeeping. Defendants use Toast to track transactions, electronic tips, sales, and for other purposes.

28.     Upon information and belief, both Slingshot and Circuit are registered to the same Toast account.

29.     Upon information and belief, Slingshot has utilized Toast since its opening on or around November 8, 2019.

30.     Upon information and belief, Circuit has utilized Toast since its opening on or around October 18, 2017.

**D.     Tip Tracking.**

31.     All non-cash transactions at Slingshot and Circuit are processed through Toast, including tips paid by customers to employees.

32.     Each employee of Circuit and Slingshot is assigned a numerical access code that is used to log into Toast.

33.     When checking out via Toast, customers are shown a prompt asking they would like to add a tip to the total charge. Customers may leave tips of varying percentages, a specific amount, or no amount at all. The bottom of the prompt asks for the customer's signature, and the button below the signature line reads "Complete Payment," which authorizes the transaction.

34.     When a customer pays a tip via Toast, the tip is assigned to the employee who was logged into Toast at the time of the transaction.

10

35.     Toast tracks the tips collected by employees in two ways.  First, it tracks "non-cash" tips, which are tips paid directly via Toast.  Second, it tracks "declared tips," which are cash tips that employees must manually enter into Toast.  Slingshot and Circuit did not require employees to enter "declared tips."

**E.     Tip Retention Policy at Circuit from October 18, 2017 to November 8, 2019.**

36.     From October 18, 2017 to November 8, 2019, Circuit paid its employees on an hourly basis, in addition to certain tips they received from customers.

37.     Importantly, during this time-period, Circuit did not distribute all tips received from customers to the employees who collected them.  Upon information and belief, Circuit restricted the amount an employee could receive in tips to between $4.00 and $5.00 per hour.

38.     Plaintiff Gagorik, for example, worked 48.48 hours from October 22, 2018 to November 4, 2018.  During this period, Plaintiff Gagorik was paid $235.13 in tips, an average of $4.85 in tips per hour worked.  Plaintiff Gagorik, however, earned substantially more in tips during this time-period than what he was paid.  Upon information and belief, the excess tips were retained by Defendants.

39.     Plaintiff Gagorik worked 38.18 hours from April 8, 2019 to April 21, 2019 and was paid $171.81 in tips—an average of $4.50 in tips per hour worked.  Plaintiff Gagorik, however, earned substantially more in tips during this time-period than what he was paid.  Upon information and belief, the excess tips were retained by Defendants.

40.     From April 22, 2019 to May 5, 2019, Plaintiff Gagorik worked 50.72 hours and was paid $215.56 in tips—an average of $4.25 in tips per hour worked.  Plaintiff Gagorik, however, earned substantially more in tips during this time-period than what he was paid.  Upon information and belief, the excess tips were retained by Defendants.

41.     From October 21, 2019 to November 3, 2019, Plaintiff Gagorik worked 64.62 hours and was paid $258.48 in tips—an average of $4.00 in tips per hour worked.  Plaintiff Gagorik, however, earned substantially more in tips during this time-period than what he was paid.  Upon information and belief, the excess tips were retained by Defendants.

**F.     Tip Retention Policy at Circuit & Slingshot from November 8, 2019 to Present.**

42.     On or around November 8, 2019, Defendants opened Slingshot and changed the tip retention policy at Circuit to mirror the tip retention policy at Slingshot.

43.     Specifically, from Slingshot's opening on or around November 8, 2019 to the present, Defendants have maintained and enforced a policy whereby they retain each and every electronic tip paid to employees working at Slingshot.

44.     On or around November 8, 2019, Defendants also changed Circuit's policy of paying electronic tips, but with a cap, to match Slingshot's policy of retaining all electronic tips paid to employees.   In other words, when Slingshot opened, the Lupicas implemented an across-the-board policy that all electronic tips paid to employees working at both Slingshot or Circuit would be retained, by them.

45.     Pursuant to this policy, when clocking out of the timekeeping system used by Defendants, Plaintiffs and those similarly situated were instructed to select the option of clocking out "without tips."

46.     Upon information and belief, no electronic tips have ever been paid to Defendants' employees working at Slingshot, including Plaintiffs and those similarly situated.

47.     Upon information and belief, no electronic tips have been paid to Defendants' employees working at Circuit since November 8, 2019.

48.    For example, Plaintiff Gagorik did not receive any electronic tips from November 2019 until his termination in June 2020.  Upon information and belief, neither Plaintiff Hughes nor Plaintiff Carcedo were paid any electronic tips for the duration of their respective terms of employment, despite the fact that each worked in a customer facing position and regularly received electronic tips from customers via Toast.

49.    Defendants have unlawfully retained tips earned by employees working in various positions, including but not limited to: Server, Host, Hostess, Beer Tap Associate, General Manager, Bar Manager, Shift Manager, Shift Leader, Point of Sale Attendant, Team Leader, Bartender, and Manager of Alcohol and Alcohol Purchasing.

50.    In fact, Defendants publicly acknowledge that they do not distribute tips to employees.  On Slingshot's website, there is a letter, dated June 29, 2020, that is addressed from "The Lupica Family" to the "Richmond community," in which the Lupicas attempt to respond to "unsavory comments on social media about [their] business practices."[1]  In this letter, the Lupicas represent that they do not pay tips to employees because "our self-serve model does not lend itself to tip based compensation."   Both Circuit and Slingshot are referenced throughout the letter. Moreover, in the pdf version of the letter, the logo for Slingshot appears in the top left portion of the header, and the logo for Circuit is clearly displayed in the upper right portion.

51.    Similarly, Circuit's website contains an "FAQ" section addressing why tips are not distributed to employees.  In pertinent part, that section states that tips are subject to "fluctuation," and that a tip-based system "did not provide a reliable lifestyle for some of our employees[.]"[2]

---

[1] *Letter to Richmond*, https://slingshotgameclub.com/letter-to-richmond/ (last visited March 21, 2021).

[2] *FAQ*, https://thecircuitarcadebar.com/venue-faq/ (last visited February 3. 2021).

**G.      Defendants' Nonpayment of Overtime.**

52.      Upon information and belief, all employees of Defendants, with few exceptions, are classified as non-exempt under the FLSA.  This includes but is not limited to the following positions: Server, Host, Hostess, Beer Tap Associate, General Manager, Bar Manager, Event Coordinator, Event Manager, Barback, Bar Manager. Shift Manager, Shift Leader, Point of Sale Attendant, Game Technician, Team Leader, Bartender, and Manager of Alcohol and Alcohol Purchasing.

53.      Employees of Defendants track their time using a timekeeping software maintained by Capital Payroll Partners, a local payroll company.  Defendants customarily provide employees with two sets of login credentials: one for Circuit and another for Slingshot.  To the extent employees work at other entities owned by the Lupicas, such as Circuit Social in Norfolk, Virginia, they are provided access credentials for that venue as well.

54.      At all times relevant, the Lupicas enforced an unwritten policy that prohibited employees working at Circuit and Slingshot from working in excess of 40 hours per week.

55.      Despite this unwritten policy, employees regularly worked in excess of 40 hours per week due to scheduling errors, to cover dropped shifts, or because they were instructed to do so by their supervisors.

56.      Given their substantial involvement in the everyday operations of Slingshot and Circuit, the Lupicas were aware of the occasions on which employees worked in excess of 40 hours per week.

57.      The Lupicas consistently and unlawfully avoided their obligation to pay overtime to non-exempt employees who worked in excess of 40 hours per week.  They did so in one of four ways.

58.     The first way the Lupicas would evade their overtime obligations was by modifying employee timesheets so that any overtime hours worked in a single workweek were moved to the following workweek.  These excess hours were then paid at the employee's regular rate of pay, and not at the required overtime rate of one and one-half times the employee's regular rate of pay.

59.     The second way the Lupicas would evade their overtime obligations was by modifying employee timesheets so that any overtime hours worked in a single workweek were moved to another entity (e.g., if an employee worked 43 hours at Circuit in a single workweek, 3 hours would be moved to Slingshot).  On one occasion, for example, Plaintiff Hughes informed Ingrid Lupica that she had worked over 40 hours at Slingshot for that workweek.  In response, Mrs. Lupica informed Plaintiff Hughes that the hours would be moved to Circuit.   Similarly, on the occasions when Plaintiff McKoy worked in excess of 40 hours in a workweek, the excess hours were moved to the venue where she had not been primarily working.  These excess hours were then paid at the employee's regular rate of pay, and not at the required overtime rate of one and one-half times the employee's regular rate of pay.

60.     Third, the Lupicas would evade their overtime obligations by instructing employees to log hours inaccurately.  Indeed, employees were instructed that, if they were approaching 40 hours of work in a single workweek, they were to clock out of the timekeeping account for the venue where they were working, and clock into the timekeeping account for the venue where they were not working.  For example, Plaintiff McKoy was instructed on numerous occasions to clock out of her timekeeping account for Circuit and clock into her timekeeping account for Slingshot because she was approaching 40 hours of work for Circuit in that workweek.  On these occasions, Plaintiff McKoy continued working at Circuit even after logging into her Slingshot account.  The

excess hours were then paid at the employee's regular rate of pay, and not at the required overtime rate of one and one-half times the employee's regular rate of pay.

61.     Fourth, upon information and belief, the Lupicas would, on certain occasions, modify employee timesheets to simply remove overtime hours worked.  For example, on one occasion when Plaintiff McKoy exceeded 40 hours in a single workweek, Mrs. Lupica told her she would not be paid for the excess hours.  Similarly, Mrs. Lupica told Plaintiff Jarvis, on a number of occasions, that he would not be paid extra if he went into overtime, and threatened to terminate him if he did.

62.     Moreover, the Lupicas freely permitted employees to work in excess of 40 hours per week as long as the excess hours were recorded at another entity owned by the Lupicas.  For example, when Plaintiff Hughes was hired, she was told that she could work up to 40 hours a week at Slingshot, and that, if she wanted more hours, she could get them by working at Circuit.  The Lupicas, however, did not pay the required overtime rate for such hours.  Indeed, the Lupicas treated hours worked for Slingshot and Circuit as entirely separate, even though the entities are jointly owned, managed, and operated.

63.     Defendants have consistently, repeatedly, and intentionally failed to pay their employees an overtime rate of one and one-half times their employees' respective regular rates of pay, including Plaintiffs and all employees similarly situated.

## COLLECTIVE ACTION ALLEGATIONS

64.     Plaintiffs bring the First Count under 29 U.S.C. § 216(b) on behalf of themselves and the following FLSA Collective subclass:

> All workers employed by Defendants in the positions of Server, Host, Hostess, Beer Tap Associate, General Manager, Event Coordinator, Event Manager, Barback, Bar Manager, Shift Manager, Shift Leader, Point of Sale Attendant, Game Technician, Team Leader, Bartender, Manager of Alcohol and Alcohol Purchasing, or in any

other position in which such workers received or collected tips from customers via Toast, at any time within three years of the filing of this action.

65.     Plaintiffs bring the Second Count under 29 U.S.C. § 216(b) on behalf of themselves and the following FLSA Collective subclass:

> All current or former non-exempt employees of Defendants who worked in excess of forty (40) hours for either Slingshot and/or Circuit at any time within three years of the filing of this action.

66.     At all relevant times, Plaintiffs and the two FLSA Collective subclasses have been similarly situated, and have all been subject to Defendants' common policies, plans, and practices of retaining electronic tips paid to employees and refusing to pay employees time-and-a-half overtime wages.

67.     Defendants' unlawful conduct has been pursuant to corporate policies or practices of minimizing labor costs by failing to properly pay Plaintiffs and the two FLSA Collective subclasses.

68.     Defendants are aware or should have been aware that federal law prohibited them from retaining employee tips.

69.     Defendants are aware or should have been aware that federal law required them to pay non-exempt employees an overtime premium for hours worked over 40 per workweek.

70.     Defendants' unlawful conduct has been widespread, repeated, and consistent.

71.     The causes of action set forth herein are properly brought under and maintained as an opt-in collective action under 29 U.S.C. § 216(b).

72.     The members of the two FLSA Collective subclasses are readily identifiable and ascertainable.

73. For the purpose of notice and other purposes related to this action, the two FLSA Collective Subclass members' names, addresses, email addresses, and phone numbers are readily available from Defendants' records.

## COUNT I – UNLAWFUL RETENTION OF TIPS UNDER THE FLSA
### (29 U.S.C. § 203(m))

74. Plaintiffs incorporate the preceding paragraphs by reference.

75. Under the FLSA, tips are the property of the employee, not the employer.

76. The FLSA expressly prohibits employers, managers, and supervisors from keeping any portion of tips received by employees for any purpose, regardless of whether the employer takes a tip credit. *See* 29 U.S.C. § 203(m).

77. Plaintiffs and those similarly situated regularly and customarily earned and received tips from customers.

78. Defendants willfully and intentionally retained tips paid by customers to Plaintiffs and those similarly situated.

79. Defendants knew of and showed reckless disregard for the provisions of the FLSA because Defendants knew or should have known that Defendants were not allowed to take any portion of tips paid to Plaintiffs and those similarly situated.

80. Defendants' actions were willful and intentional, and for the express purpose of benefitting themselves to the detriment of their employees.

81. Plaintiffs and those similarly situated are entitled to unpaid wages, liquidated damages, interest, and attorney's fees and costs under the FLSA.

## COUNT II – FAILURE TO PAY OVERTIME COMPENSATION
### (29 U.S.C. § 207)

82.     Plaintiffs incorporate the preceding paragraphs by reference.

83.     Under the FLSA, any employee who works in excess of forty (40) hours in a workweek must be compensated at a rate of at least one and one-half times the employee's regular rate of pay.

84.     Defendants suffered and permitted Plaintiffs and those similarly situated to routinely work more than forty (40) hours in a workweek without proper overtime compensation as required by the FLSA.

85.     Defendants knew or showed reckless disregard for the fact that they failed to pay these individuals overtime compensation, constituting a willful violation of the FLSA.

86.     Defendants' failure to comply with the FLSA overtime protections caused Plaintiffs and those similarly situated to suffer loss of wages and interest thereon.

87.     At all times material hereto, Defendants failed to maintain proper time records as mandated by the FLSA.

88.     Defendants' actions were willful and intentional, and for the express purpose of benefitting themselves to the detriment of their employees.

89.     Plaintiffs and those similarly situated have incurred substantial damages as a result of Defendants' actions, and are entitled to unpaid overtime, liquidated damages, interest, and attorney's fees and costs under the FLSA.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and those similarly situated, pray for relief as follows:

1.      Certification of a collective action under § 216(b) of the FLSA and permitting notice to the putative plaintiffs;

2.      Judgment against Defendants for violation of the overtime provisions of the FLSA;

3.      Judgment against Defendants for violation of the anti-tip retention provisions of the FLSA;

4.      Judgment against Defendants for an amount equal to Plaintiffs' and the FLSA Collective's unpaid overtime wages, and liquidated damages;

5.      Judgment against Defendants for an amount equal to Plaintiffs' and the FLSA Collective's unpaid tips, and liquidated damages;

6.      Judgment finding that Defendants' violations of the FLSA were willful;

7.      An award of any pre- and post-judgment interest;

8.      An award of reasonable attorneys' fees and costs;

9.      Leave to add additional plaintiffs and/or claims by motion, the filing of written consent forms, or any other method approved by the Court; and

10.     Such further relief as may be appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs demands a trial by jury on all triable issues pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: April 16, 2021                                    Respectfully submitted,

                                                        /s/ Aaron D. Siegrist
                                                        Aaron D. Siegrist (VSB No. 91072)
                                                        Benjamin D. Johnson (VSB No. 90812)
                                                        PIERCE MCCOY, PLLC
                                                        313 East Broad St., Suite 72
                                                        Richmond, Virginia 23219
                                                        Tel: 804-413-4021
                                                        Fax: (757) 257-0387
                                                        asiegrist@piercemccoy.com
                                                        bjohnson@piercemccoy.com


                                                        Joshua L. Jewett (VSB No. 76884)
                                                        PIERCE MCCOY, PLLC
                                                        101 West Main Street, Suite 101
                                                        Norfolk, Virginia 23510
                                                        Tel: (757) 286-2903
                                                        Fax: (757) 257-0387
                                                        jjewett@piercemccoy.com

                                                        *Counsel for Plaintiffs*